UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID DARRELL SANDERS,  No. C-10-0891 EMC (pr)

    Petitioner,

    v.  **ORDER DENYING HABEAS PETITION**

DERRAL ADAMS, Warden,

    Respondent.
_____/

## I. INTRODUCTION

David Darrell Sanders filed this *pro se* action seeking a writ of habeas corpus under 28 U.S.C. § 2254. The matter is now before the Court for consideration of the merits of the habeas petition. For the reasons discussed below, the petition will be denied.

## II. BACKGROUND

A.   Procedural History

On February 4, 2008, an Alameda County Superior Court jury found Petitioner guilty of attempted extortion. The court found true allegations that Petitioner had suffered two prior convictions. Petitioner was sentenced to 25 years to life in prison.

Petitioner appealed. The California Court of Appeal affirmed the conviction, and the California Supreme Court denied his petition for review. Petitioner subsequently filed several petitions in the state superior court, Court of Appeal, and Supreme Court, which were denied.

Petitioner then filed this action, seeking a writ of habeas corpus. Petitioner originally asserted three claims for habeas relief: (1) the evidence was insufficient to support the verdict, (2)

he received ineffective assistance of counsel, and (3) his guilty pleas that led to his earlier convictions were the product of inadequate plea advisements. Eventually, he abandoned the last two claims, and only the insufficient evidence claim remained for adjudication. Respondent filed an answer addressing that claim. In his traverse, Petitioner argued that he is entitled to relief on his claims that the evidence was insufficient to support the verdict and that there was a jury instruction error. The petition, and amendments thereto, did not contain a claim of jury instruction error and Petitioner cannot simply add a new claim in his traverse. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (traverse is not the proper pleading to raise additional grounds for relief). The jury instruction error claim is dismissed.

B.  The Crime

Petitioner alleges that his actions constituted a lawful offer to contract with Richard Inocencio rather than the crime of attempted extortion. *See* Petition p.9. The following factual background is taken from the order of the California Court of Appeal.

> Richard Inocencio, the victim in this matter, was 57 years old at the time of trial. He had suffered a stroke two years previously and had some ongoing memory and hearing issues. He had owned a roofing company in San Leandro for about 20 years. He also owned a transitional care home for recovering addicts and homeless people in Hayward.
>
> According to the director of the transitional care home, in May 2007, approximately $2,500 in cash and some prescription medication was stolen from an unlocked file cabinet in the office of the home. The theft was common knowledge among the home's residents, but was not reported to the police. The home's records did not show the names of either appellant or his brother (and codefendant) Allen as prior residents of the home.
>
> In late May 2007, Inocencio started receiving calls on his cell phone from a person-later identified as appellant-who told him that "things" were going to be taken from his safe and he was going to be "in big trouble" and needed appellant's help because "people can get hurt." Appellant wanted money, specifically $10,000, to protect Inocencio from the people planning to get money from him and to let him know who was planning the theft. Appellant's number did not appear on Inocencio's cell phone.
>
> Appellant said things that made Inocencio feel concerned for his and his family's safety. Specifically, appellant said he was driving by Inocencio's house and described the car that was parked in the driveway, which made Inocencio realize appellant knew where his house was. Appellant also told Inocencio that he knew Inocencio was

doing a roofing job on a particular house on Nob Hill in San Francisco. The phone calls frightened Inocencio so much that he immediately moved his pregnant daughter out of his house.

Inocencio had no idea who was calling him, but he felt scared. He therefore decided to go to the sheriff's department in San Leandro, where he met with Detective Mike Godlewski.

Detective Godlewski, a deputy sheriff with the Alameda County Sheriff's Office, was assigned to the crimes against persons unit. On May 29, 2007, Inocencio came into a substation in San Leandro and Godlewski met with him and took his report about a person attempting to extort money from him. He said he was expecting a call from the person shortly, so Godlewski obtained a tape recorder and device that could be plugged into Inocencio's cell phone to record the call. The phone call came a short time later, with appellant's phone number blocked. Inocencio talked with appellant for 11 minutes. The recorder did not function properly and Godlewski could only hear a bit of appellant's part of the conversation.[3]

During the recorded conversation, Inocencio said, "I want to find out who these people are that you say is going to rob me, man. I'm really concerned about that 'cause I don't want me to get hurt, my family, you know. If I have to pay five or ten thousand dollars, I'll have to pay it. What the fuck. I'm going to save my family first, man." When Inocencio said he was glad to hear appellant worked because it meant he would not be bothering Inocencio during his eight-hour shift, appellant responded, "Well, ... just you take care of that shit." Near the end of the conversation, Inocencio said he could get $8,000 to give to appellant, and appellant apparently said he would call again the next day.

The following day, Inocencio called Godlewski, and he was "highly upset." He told Godlewski appellant had been by Inocencio's home and had described the vehicle in his driveway, which showed that he knew where Inocencio lived. At approximately 5:45 p.m., Godlewski and Inocencio met at an animal shelter in San Leandro; Inocencio was anticipating another phone call.

At approximately 6:13 p.m., appellant called Inocencio and Godlewski used a digital recorder to record both sides of the conversation. During that conversation, Inocencio said that he had gotten the money, but had put it into his safe deposit box because he had not heard back from appellant. Appellant later said, "I told you to have it. I will contact you. You're gonna meet with me and I'm going to share the information with you in exchange for the money and after that then, you know, you can take your information in. You gonna know what it is once you hear it. You gonna know who it is, you gonna hear, everything's gonna come together, I guarantee you."

Appellant then said that Inocencio would need to have the money at 4:00 p.m. the next day, and continued: "I will contact you and you know, to protect me, we'll have to go through a series of chains of things in order for us to connect. I'm not no dummy, okay? I don't know who you have contacted and I don't know what you're, maybe,

1
2
3
4
5
6

... attempting to do on your hand, but, I'm ligit [*sic* ] and I'm telling you that this is gonna come down on you and so, to prevent it you need to have the information about these people. Once you know the people, once that's revealed to you, everything's gonna make sense to you. All your dealings that you have been dealing with them over the years, okay, it has come to the point where they, they're upset with you about just certain things and once you get these names, it's gonna become crystal clear to you. Everything gonna click. So, you gonna be able to put the pieces together and you gonna be able to, you know, know what to do from there. You just need to know who and without that information, they got you for your, your safe at your other place."

7
8
9
10
11
12

Appellant then asked, "How would I know all this information, you know, how would I know you getting a house built on Nob Hill?" Appellant again mentioned the house Inocencio was involved in building on Nob Hill, and then said, "You see, you'd be surprised, you know, because the amount of information I already have on you but that's not for me to, you know, try to do you in. I'm trying to protect you, you know, on the one hand, and for my giving you this information I just ask for a compensation." Finally, appellant told Inocencio to "have it [the money] together at 4 o'clock when I call you."

13
14
15
16
17
18
19
20
21

On May 31, 2007, at approximately 3:45 p.m., Godlewski and his supervisor, Sergeant Scott Dudek, met Inocencio again at the animal shelter. Inocencio brought $5,300, which he had withdrawn from his bank. Three detectives also came to act as surveillance units. Godlewski told Inocencio that, when he received the phone call regarding where to meet, Inocencio should try to keep the meeting within the local jurisdiction and not to let the suspect into his vehicle. Godlewski asked Inocencio to wear a body wire, but Inocencio "pretty much flipped out," became upset and started screaming, and said no repeatedly. Inocencio was scared and screamed that he felt nauseous and that he was going to throw up in the bushes. Godlewski put the wire on the visor of Inocencio's pickup truck. He told Inocencio to repeat everything appellant said so Godlewski would know what he was saying. Inocencio was also too afraid to keep the money in the cab of his truck and put it in the bed of the truck under a piece of wood. He said he did not want to let the suspect into his vehicle and wanted limited contact with him for his own safety.

22
23
24
25
26

At 4:41 p.m., Inocencio received a phone call from the same caller, who asked Inocencio to meet him at 6:00 p.m. and said he would call back at 5:30 p.m. Appellant called again at 5:35 p.m. and told Inocencio to drive to downtown Oakland. Inocencio said he did not want to go to Oakland and they agreed to meet at a Shell station on 150th Avenue, where appellant would call him again. Appellant told Inocencio, "[Y]ou know, your suspicion is [*sic*] only been alerted because of the information that I've given you thus far. However, you know, if I wanted to do something, I know where your office is on East 14th."

27
28

Godlewski and the other deputies followed Inocencio to the Shell station. Once there, Inocencio called Godlewski and said he had been told to head to Benedict Drive. Godlewski followed Inocencio to

> Benedict and then heard Inocencio over the wire communicating with appellant, stating, "give it to the guy in the gray shirt and the black hat?" Inocencio turned into a parking lot at Kindred Hospital. On the sidewalk, Godlewski saw a man wearing a gray shirt and black hat talking on a cell phone. Godlewski drove past the man, who was watching him go by, and went into the parking lot.
>
> Godlewski heard Inocencio arguing over the wire, insisting that he would not give the money to anyone other than appellant. There were not many vehicles or pedestrians around, but the man in the gray shirt and black hat was still standing on the sidewalk. Within a minute after he arrived in the parking lot, Godlewski saw a white vehicle with one person inside pull out of the driveway of the hospital parking lot and drive past the man on the sidewalk and continued south, out of sight.
>
> After Inocencio turned into the parking lot, following appellant's instructions, appellant told Inocencio to look for a person in a gray sweatshirt. Inocencio eventually saw the man on the sidewalk, and appellant told him to give the money to him. Inocencio refused to give the money to the other man, saying he would give it only to appellant. Appellant then hung up. When he called back, he seemed "pretty upset," and said, "[y]ou better have all your buddies with you." He also told Inocencio that "he got all the building surrounded, and he was telling me that the police were going to surround me. You blew it now, and that's it. He hung up [and] he was mad." Appellant called back one more time and told Inocencio that "you really did it now." These calls made Inocencio feel "pretty scared."
>
> Godlewski, who had changed location slightly, saw the white car return, pick up the man in the gray shirt and black hat, and then drive north. Appellant was the driver of the car and the passenger was appellant's brother, codefendant Allen Sanders. Godlewski spoke with Inocencio and said to meet him back at the animal shelter while other deputies tailed appellant and his brother.
>
> Deputies stopped the car containing appellant and his brother at 6:24 p.m. When appellant was detained, he identified himself to officers as Kamua Kambon. He had in his possession two driver's licenses, one in the name of Kamua Kambon and the other in the name of David Sanders. Both men were taken to a sheriff's substation. Appellant's brother Allen was dressed in a gray t-shirt, sweatpants, and a black baseball cap. Police subsequently decided to release appellant and his brother pending receipt of their cell phone records.
>
> Phone records ultimately indicated that appellant and his brother spoke with each other by cell phone before and during the time of the planned money drop-off. Appellant's phone records also showed that he was the person calling Inocencio and that each time he called, he hit "star 67" to prevent his phone number from appearing on Inocencio's phone.

*People v. Sanders*, 2009 WL 3470402, at *1-4 (Cal. Ct. App. 2009).

5

## III. JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. *See* 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Alameda County, California, within this judicial district. *See* 28 U.S.C. §§ 84, 2241(d).

## IV. EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), (c). The parties do not dispute that the state judicial remedies were exhausted for the insufficient evidence claim.

## V. STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but

6

1  unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  "[A] federal
2  habeas court may not issue the writ simply because that court concludes in its independent judgment
3  that the relevant state-court decision applied clearly established federal law erroneously or
4  incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.  A federal habeas court
5  making the "unreasonable application" inquiry should ask whether the state court's application of
6  clearly established federal law was "objectively unreasonable." *Id.* at 409.

## VI.  DISCUSSION

A.  Due Process Claim

Petitioner argues that there was insufficient evidence of intent to support his conviction for attempted extortion under California Penal Code § 524.  He contends he was offering to provide information to the victim, and that it was "well within the realm of possibilities that one or more persons actually were planning on robbing Mr. Inocencio and/or burglarizing his property," so his interaction with the victim was "no different than that of a security company salesman offering a burglary alarm system to a potential home-owner customer."  Docket # 1, p. 9.  Petitioner argues that he "did not threaten Inocencio; rather, he offered to share certain information with Inocencio for a price." *Id.* at 10.  He notes that he told Inocencio, "I'm trying to protect you, you know, on the one hand, and for my giving you this information I just ask for a compensation." *Id.* at 11.  As Petitioner sees it, his actions "should not be considered a 'threat' under section 519, but rather a basic oral contract, entered into willingly and voluntarily by one party in possession of a good or service and another party desirous of the good or service. As such, this should be considered a legal transaction between contracting parties." *Id.*

California Penal Code section 518 defines extortion as "the obtaining of property from another, with his consent . . . induced by a wrongful use of force or fear . . . ."  The "fear" in extortion may be induced by a threat "[t]o do an unlawful injury to the person or property of the individual threatened or of a third person."  Cal. Penal Code § 519.  "The elements of the crime of *attempted* extortion are (1) a specific intent to commit extortion and (2) a direct ineffectual act done towards its commission." *People v. Sales*, 116 Cal. App. 4th 741, 749 (Cal. Ct. App. 2004) (emphasis added); *see* Cal. Penal Code § 524.  "Threats may consist of a menace of destruction or

7

injury to person or property. No precise or particular form of words is necessary in order to constitute a threat under the circumstances. Threats can be made by innuendo and the circumstances under which the threat is uttered." *People v. Oppenheimer*, 209 Cal. App. 2d 413, 422 (1962). The fear may be induced by threats of harm by third parties rather than the extorting party himself. *People v. Hopkins*, 105 Cal. App. 2d 708, 709-10 (1951).

The California Court of Appeal rejected Petitioner's challenge to the sufficiency of the evidence. The court stated:

> In the present case, appellant argues that he "did not threaten Inocencio; rather, he offered to share certain information with Inocencio for a price." Appellant notes that he told Inocencio, "I'm trying to protect you, you know, on the one hand, and for my giving you this information I just ask for a compensation." Thus, according to appellant, his actions "should not be considered a 'threat' under section 519, but rather a basic oral contract, entered into willingly and voluntarily by one party in possession of a good or service and another party desirous of the good or service. As such, this should be considered a legal transaction between contracting parties." Although appellant's argument is certainly creative, we find it unpersuasive.
>
> The evidence adduced at trial amply demonstrated implied threats on the part of appellant. (See *Oppenheimer,* at p. 422, ["'No precise words are necessary to convey a threat. Conduct takes its legal color and quality more or less from the circumstances surrounding it'"].) Evidence of these implied threats included appellant's efforts at remaining anonymous, his promises to protect Inocencio and his family from unspecified harm - "People can get hurt" -in exchange for money, and his statements showing he knew the location of Inocencio's home, office, and work site, including the remark: "[I]f I wanted to do something, I know where your office is on East 14th." Moreover, when he learned that Inocencio had returned the payoff money to the bank, appellant said, "I told you to have it. I will contact you. You're going to meet with me and I'm going to share the information with you in exchange for the money...." Then, when Inocencio refused to give the money to appellant's brother, appellant said that Inocencio had "really messed up now. You better have all your buddies with you." Inocencio's fear of appellant is also circumstantial evidence of appellant's intent to instill fear in his victim. (Cf. *Oppenheimer,* at p. 422 ["'[t]he more vague and general the terms of the accusation the better it would subserve the purpose of the [defendant] in magnifying the fears of his victim'"].)
>
> Taken together, all of this evidence supports a finding of implied threats that harm would befall Inocencio and his family if the money demanded were not paid. (See *Oppenheimer,* at 422 ["Threats can be made by innuendo and the circumstances under which the threat is uttered"].) A reasonable jury plainly could (and did) conclude that appellant's words and actions constituted an attempt to obtain money from Inocencio, with his consent, by a wrongful use of fear. (See [Cal.

8

> Penal Code] §§ 518, 524.) The verdict is supported by substantial evidence. (See *People v. Little, supra,* 115 Cal.App.4th 766, 771 (2004).

*People v. Sanders*, 2009 WL 3470402, at *5-6.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338. A federal habeas court applies the standards of *Jackson* with an additional layer of deference under the AEDPA, generally asking whether the state court's decision reflected an unreasonable application of *Jackson* and *Winship* to the facts of the case. *See Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005); *see, e.g.*, *McDaniel v. Brown*, 558 U.S. 120, —, 130 S. Ct. 665, 672-74 (2010) (per curiam) (Ninth Circuit erred by failing to review all of the evidence in light most favorable to the prosecution when it resolved inconsistencies in testimony in favor of petitioner). "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (citing *Jackson*, 443 U.S. at 319). In sum, "the only question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality." *Id.* at 2065.

Petitioner's contention that the evidence was insufficient to support the conviction fails. The record supports the state appellate court's conclusion that a rational trier of fact could have found the elements of attempted extortion under § 524 proven beyond a reasonable doubt. A rational jury could have concluded that petitioner's request for the money was an attempt to obtain property from Inocencio through the wrongful use of fear. Petitioner indicated to Inocencio that for the sum of

1  $10,000, he would effectively protect Inocencio from other people who Petitioner said were trying
2  to steal money from him, and would tell Inocencio who those people were. RT 908, 915, 993.  A
3  rational jury could have found that Petitioner's statements showed an attempt to induce Inocencio to
4  consent to pay by instilling fear in him that his (Inocencio's) person or property would be unlawfully
5  injured.  His communications implied more than Petitioner's ability to supply information about
6  third party perpetrations; they implied that Petitioner had control or influence over those who would
7  do harm to Inocencio.  Why else would Petitioner describe to Inocencio the car in Inocencio's
8  driveway, implying that he knew where Inocencio lived?  RT 909.  Why else would Petitioner block
9  his telephone number each time he called Inocencio, hiding his identity?  RT 911.  Why else would
10 Petitioner tell Inocencio, "You'd be surprised about the amount of information I already have on
11 you."  RT 1771.  Why else would Petitioner tell Inocencio, "you know, your suspicion [has] only
12 been alerted because of the information I've given you thus far.  However, you know, if I wanted to
13 do something, I know where your office is on East 14th"?  Suppl. Clerk's Transcript, exh. 4d, p. 10
14 (quoted in *People v. Sanders*, 2009 WL 3470402, at *3).  Why else would Petitioner inform
15 Inocencio that he knew Inocencio was finishing a roofing job in Nob Hill, indicating that Petitioner
16 had been monitoring Inocencio closely.  On the basis of these facts, a rational jury could infer from
17 Petitioner's words and actions that (rather than merely acting as a good Samaritan), Petitioner was
18 attempting to obtain money from Inocencio, with his consent, by the wrongful use of fear from harm
19 over which Petitioner exercised control, whether that harm would be inflicted by Petitioner or a third
20 party with whom Petitioner was affiliated.  *See Hopkins*, 105 Cal. App. 2d at 709-10.  The fact that
21 Petitioner offers an alternate explanation for his words and actions does not establish that it was
22 irrational for a jury to find him guilty.  The prosecution need not affirmatively rule out every
23 hypothesis except that of guilt.  *See Jackson*, 443 U.S. at 326).

24      Under *Coleman* and *Jackson,* the standard is whether the jury's finding was so insupportable
25 as to fall below the threshold of bare rationality.  The state appellate court did not unreasonably
26 apply this standard in rejecting Petitioner's challenge to the sufficiency of evidence.  He therefore is
27 not entitled to a writ of habeas corpus.

28

B.     No Certificate of Appealability

A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

### VII. CONCLUSION

The petition for writ of habeas corpus is denied.

The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

Dated: November 29, 2012

_____
EDWARD M. CHEN
United States District Judge

11